# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## FICKLEN v. FREDERICKSBURG POWER COMPANY, INC., ET ALS.

### June 15, 1922.

1. WATERS AND WATERCOURSES—*Partition—Construction of Contracts— Deed and Award Concerning Certain Water Rights.*—In the instant case, a suit for partition of certain mill property and water rights, the court construed certain contracts, a deed and award of an arbitrator, and determined the amount of water to which complainant was entitled.

2. ARBITRATION AND AWARD—*Finality of Award—Case at Bar.*—An award in regard to disputed water rights was made nearly three-quarters of a century ago and was accepted by the parties over their own signatures, and rights of third parties had more than once attached to the rights established by the award.

   *Held:* That it was beyond the province of any court to say at this late day whether the award was correct or incorrect.

3. WATERS AND WATERCOURSES—*Partition—Partition in Kind.*—There is nothing inherent in a water power which prevents a partition thereof in a proper case. As a general rule, water power or the right to take and use running water for a particular purpose may be actually divided among the coproprietors thereof.

4. WATERS AND WATERCOURSES—*Partition in Kind—Construction of Report of Commissioner—Case at Bar.*—The finding of a commissioner is to be interpreted in the light of the language used in the order of reference to which he is responding, and in the instant case, a suit for partition of mill property and water rights, the commissioner found that the real estate and water rights attached thereto were susceptible of convenient partition in kind between the parties entitled thereto; and the trial court overruled the exceptions of the appellant to that report and confirmed it.

   *Held:* That the decree of the trial court must be sustained.

5. WATERS AND WATERCOURSES—*Partition in Kind—Action of Trial Court in Overruling Exceptions to Commissioner's Report.*—Whether or not partition in kind of water rights was practicable was a question of fact to be determined from the evidence in the case, and, in the instant case, the commissioner, upon conflicting evidence, found that it was. The rule in the Supreme Court of Appeals is that, where the evidence is conflicting, that court will not reverse the action of the trial court overruling an exception to the report of the commissioner

and confirming it, unless the finding of the commissioner is clearly erroneous. The case in judgment is not one in which the judgment of the trial court on this question should be disturbed.

6. WATERS AND WATERCOURSES—*Grant of Water—Restriction Upon Use.*— The owners of a mill sold and conveyed a mill site and water to be taken from their milldam sufficient to run two overshot wheels to turn four pairs of stones not exceeding six feet in diameter. No restrictions was put upon the use of the water when it was granted; therefore, the grantees and their successors were entitled to the water conveyed, although their mill had been destroyed by fire. As the grantees were to engage in the same business, and to become competitors of the grantors, it will not be presumed that the grantors intended to restrict the use of the water to that particular point or for that purpose.

7. WATERS AND WATERCOURSES—*Grant of Water Power—Restriction Upon Use of Water Granted.*—In the absence of specific restrictions in the grant of a water power the grantee may make such use of the water as he chooses, provided only that he does not thereby interfere with the rights of others, but the grantor may specifically restrict the use for which the water may be employed, and when this is done it is an effective limitation upon the rights of the grantee. There is no restriction as to place where water or power granted shall be employed or enjoyed unless specified in the conveyance or contract.

8. WATERS AND WATERCOURSES—*Grant of Water Power—Restriction Upon Use of Water Granted.*—In a grant of a certain quantity of water or water power, or so much as may be sufficient for the operation of a particular plant or the conduct of a particular business, the specification of the purpose for which it is to be used, is usually taken as a measure of the quantity rather than as a limitation of the use, and the grantee is not bound to use it in the particular manner described, but may use it in a different manner, for a different purpose, or at a different place, or increase the capacity of his machinery, provided only that the quantity used is not increased.

9. WATERS AND WATERCOURSES—*Grant of Water Power—Use of Water.*— In the instant case, appellant was proposing to convey her share of the Knox mill water to property now owned by her, but which was part of the Ficklen property in 1847. This was objected to by appellee because by an agreement of 1847 Knox, appellant's predecessor in title, was forbidden to carry the water he obtained by that agreement "on the premises of said Ficklen."

*Held:* That as the appellee was not the owner of, nor interested in, the Ficklen premises upon which Knox was forbidden to carry the water, he could not be heard to raise that objection.

Appeal from a decree of the Circuit Court of Spotsylvania county. Decree for defendant. Complainant appeals.

*Reversed and Remanded.*

The opinion states the case.

*John B. Minor* and *Wm. D. Carter*, for the appellant.

*Alvin T. Embrey*, for the appellee.

BURKS, J., delivered the opinion of the court.

[1, 2] This litigation was initiated by a bill filed by Henry Warden in 1913 against the Fredericksburg Power Company, Inc., and others, for the partition of the Knox mill property, of which the complainant owned nine-tenths and the said Power Company one-tenth. In another suit brought by the same complainant in 1918 against the Spotsylvania Power Company, Inc., as the successor in interest of the Fredericksburg Power Company, the claims of the complainant and of the Spotsylvania Power Company are set forth at large and more in detail than in the first bill, and the same relief is prayed and in addition an accounting is asked, and an injunction prayed to compel the delivery to the complainant of the amount of water to which he was entitled. The real parties in interest in the two suits are the same. The reason for the institution of the second suit is set forth in the bill in that case as follows: "The said partition suit has been referred to special commissioner B. P. Willis for the usual enquiries and he is required specifically to report the amount of water to which the Knox mill site is entitled under contract with the Spotsylvania Power Company. A great mass of testimony has been taken in that suit upon this specific question. The defendant has rested and very little additional testimony remains to be taken before said cause will be ready for submission to the commissioner. The same question will be the principal cause of controversy in this suit, but your orator is advised that

the relief sought herein might not be obtained in said partition suit, wherefore, in order to avoid needless expense and delay in taking again in this suit the evidence taken in the said partition suit, as the parties and chief questions at issue are identical and the relief sought herein is incident and corollary of that sought in the said partition suit, your complainant is advised that it will be proper for the two cases to be hereafter heard together, and that the evidence heretofore taken in said partition suit shall be read in this suit."

Both bills were answered by the real defendants in interest therein, denying the claims of the complainant and setting up their grounds of defense in detail. The first bill, amongst other things, prayed "that the said real estate, together with all water and other rights, easements and privileges and the benefits thereto appurtenant be partitioned between the parties entitled thereto, or in the event that such partition be impracticable, that it be sold and the proceeds divided amongst those entitled thereto, according to their respective rights." In this prayer the Fredericksburg Power Company, Inc., united. The bill in the second suit, though not specifically praying for partition, prays that the two suits may be consolidated, not simply heard together, and that all the evidence taken in the first cause may be read and considered in the consolidated cause. Afterwards, it appearing that Ellen C. L. Ficklen had acquired all the rights and interests of Warden in the subject of litigation, the two suits were consolidated and heard as one suit, and Ellen C. L. Ficklen, the appellant, was substituted as sole complainant therein. The orders for accounts referred to were reported by the master, exceptions thereto were filed by the complainant which, so far as they affect the main question at issue between the parties, were

overruled by the trial court, and from the decree over-ruling said exceptions the appeal in this cause was taken.

In 1803 Francis Thornton and Robert Dunbar were the joint owners of a mill pond on the Rappahannock river above Fredericksburg and had control of certain water power and eligible mill sites on that side of the river. By deed dated March 3, 1803, they conveyed to the Hollingsworth brothers one and one-half (1½) acres of land for a mill site, with the right to take for said mill site from the pond of Thornton and Dunbar water sufficient to turn two water wheels with four pairs of stones not exceeding six feet in diameter, and the necessary machinery usually used for making flour and cleaning and screening wheat and corn, provided that there should be left to Thornton and Dunbar a sufficient quantity of water for their mill, which was known as the "Falls Mill." The land thus conveyed is part of what is known as the Knox mill property, and it was provided that the water should be taken by a canal of sufficient width and depth to convey water for at least five overshot wheels and from the mill seat to the river not to exceed eighteen feet in width at the bottom. By sundry conveyances prior to 1847 the title of the Hollingsworth mill site and water rights became vested in Thomas F. Knox and the title of Thornton and Dunbar to the mill pond on the Spotsylvania side of the river and of the mill known as "Falls Mill" became vested in Joseph B. Ficklen.

By a written agreement dated February 25, 1847, Ficklen sold and agreed to convey to Knox one-half of all the water power connected with, arising from or produced by the "Falls Mill" dam not theretofore conveyed to the Hollingsworths, including one-half of the water necessary for the operation of the "Falls Mill" when it was sufficient for that purpose (which

was to be regarded as a first right) and if not sufficient for that purpose then one-half of the water that said dam might supply, and in addition one-half of any surplus water which might exist after satisfying said first right and the right theretofore conveyed to the Hollingsworths, the latter being designated as the second right. The said agreement further provided that in order to ascertain the relative interests of the parties in the water power thereby conveyed, a competent person should be employed at their joint expense "to determine the quantity of water sufficient for 'Falls Mill' on its then construction," which was declared to be the same as in 1803. Alfred Duval was selected as arbitrator and on April 1, 1848, made an award in substance as follows: 1. When the water supplied by the "Falls Mill" dam exceeded eighty-five cubic feet per second Ficklen was entitled to twenty-two and one-half cubic feet as one-half of the first right, and to one-half of all water in excess of eighty-five cubic feet per second, and Knox was entitled to twenty-two and one-half cubic feet per second as one-half of the first right, forty cubic feet per second as the second right, and one-half of all water in excess of eighty-five cubic feet per second. The water which had been conveyed to the Hollingsworths and was then owned by Knox was sufficient to turn four pairs of stones from two overshot wheels sixteen feet in diameter. The award fixed ten cubic feet per second as the amount of water necessary to operate each pair of stones, thus making forty cubic feet per second for the four pairs of stones. 2. When the supply of water exceeded forty-five cubic feet per second but did not exceed eighty-five cubic feet per second, Ficklen was entitled to twenty-two and one-half cubic feet per second as one-half of the first right, and Knox

was entitled to twenty-two and one-half. cubic feet per secons as one-half of the first right, and forty cubic feet per second, or so much thereof as was available, as the second right. 3. When the supply of water was forty-five cubic feet per second, or less, Ficklen and Knox were each entitled to one-half thereof.

By deed dated June 27, 1851, Ficklen and wife conveyed to Knox "the water power sold to him by said agreement, subject to the conditions and limitations therein contained." This deed expressly refers to the agreement dated February 25, 1847, and to the Duval award made on April 1, 1848, and the said agreement and award were expressly made a part of the deed.

The Rappahannock river separates the county of Spotsylvania, which is on the south side of the river, from the county of Stafford on the north side of the river. Just above the city of Fredericksburg, which is in Spotsylvania county, the river is divided by an island known as Hunter's Island; about one-half of the river passing on each side of the island. In April, 1851, Ficklen and Knox were joint owners of the water of the river on the south side of the island so far as they had appropriated it, and there were numerous owners of water power on the Stafford side of the river. Just what was the exact amount of the appropriation by Ficklen and his predecessors in title by the old "Falls Mill" dam, or what the capacity of that dam was, does not clearly appear from the record. The sketch below, though not drawn to scale, shows approximately the power situation at Fredericksburg at this time.

The owners of the water power on the two sides of the river deemed it desirable that the whole power of the river should be concentrated in one hand, and George Aler and his associates undertook to form a

37

manufacturing company for the purpose of erecting a
dam across the river above Hunter's Island, and by

written contract dated April 15, 1851, Ficklen and
Knox and Aler and his associates, agreed that Ficklen
and Knox should convey all their works and water

power rights to the manufacturing company, which Aler and his associates proposed to organize for the purpose of acquiring and developing a greater fall by the construction of a new dam further up the stream, and for the purpose of operating all the water power afforded by the entire flow of the river, in consideration of which the company was to furnish Ficklen and Knox, at their respective mill sites, without cost to them, the amount of water to which they were respectively entitled, amounting, as expressly stated, to sufficient water to operate five pairs of five foot stones with the necessary accompanying machinery at the Ficklen mill site, and nine pairs of stones with the necessary accompanying machinery at the Knox mill, with the right also reserved by Ficklen and Knox to have any surplus water which might reach them from the existing old "Falls Mill" dam and race, which was below the proposed new dam. This agreement further stipulated that "whenever the water power generated by the dam of the said manufacturing company shall be so reduced during the low stages of the water in said river that one-half of the said water power shall be inadequate to furnish to the said parties of the first part (Knox and Ficklen) their respective measures of water power hereinbefore described, then, during such periods of time, that the said parties of the first part shall take and receive at their said mills from the said dam or other head of water of said company, a water power equal to the running of ten pairs of stones with accompanying necessary machinery, to-wit: Joseph B. Ficklen five pairs of stones and Thomas F. Knox five pairs of stones, being the estimated volume of the first or 'Falls Mill' right owned jointly by them."

In 1851 sixteen foot overshot wheels were used at both mills and such wheels continued to be used at

the Knox mill until it was burned about 1901, but some time prior to 1878 turbine wheels were substituted for the overshot at the Ficklen mill.

In a contract made July 8, 1878, between Ficklen and the Fredericksburg Power Company, the amount of water per second necessary for each run of stones was fixed at thirteen and one-half cubic feet, and the company agreed also for a rental of $120.00 per year, to furnish Ficklen nine and one-half cubic feet per second.

The manufacturing company contemplated by the agreement of April 15, 1851, was chartered and organized under the name of Fredericksburg Water Power Company, and in 1856 Ficklen conveyed to it his interest in the "Falls Mill" dam, works and water power, but the records do not show any conveyance from Knox, or any subsequent contract between him and the said company, nor is the agreement of April 15, 1851, signed by the company. Knox, however, after the organization of said company, received the water for his mill through the works of said company and the company and its successors seemed to have been satisfied to rest their title upon the contract of April 15, 1851. The Spotsylvania Power Company is the successor in title and obligation of the Fredericksburg Water Power Company, and is obligated to furnish to the Knox mill site the amount of water called for by the contract of April 15, 1851.

The interest of Knox in the Knox mill property and its water rights has, by descent and purchase, now become vested in the appellant, Ellen C. L. Ficklen, and the Spotsylvania Power Company as tenants in common in the proportion of nine-tenths to Mrs. Ficklen and one-tenth to the Spotsylvania Power Company. The Knox mill burned about 1901 and since

then the power company has furnished no water to that site. For some time prior to the time that it was burned it had ceased to manufacture flour and had been used for other purposes not necessary to be detailed here. The Knox mill, when in operation, for a long time operated with two overshot wheels sixteen feet in diameter, and at a later period, the exact date of which is not given, an addition was made to the mill and a third wheel of about the same dimensions was put in.

The chief question now at issue between the parties is, how much water, in cubic feet per second, is the Knox mill site entitled to? Knox was not a riparian owner and all of his water rights were acquired by contract. He never acquired any additional water rights after the agreement of 1851. Thornton and Dunbar's rights were only those of appropriation and it nowhere appears what was the capacity of the "Falls Mill" dam or how much, if any, it furnished over eighty-five cubic feet per second. Nor does it appear how many stones were operated by the "Falls Mill." Under the agreement of April 15, 1851, in which Ficklen and Knox are mentioned as parties of the first part, it was stipulated "that the said parties of the first part and their heirs will be content to take and receive the present measure of water power to which they are entitled to now and held appurtenant to their said mill sites respectively (amounting to water power equal to the running of five pair of stones of a diameter of five feet, and necessary accompanying machinery appurtenant to the mill site of the said J. B. Ficklen, and amounting to a water power equal to the running of nine pair of stones of five feet diameter with the necessary accompanying machinery as appurtenant to the mill site of the said Thomas F. Knox)

from the dam or other head of water, which may be constructed by the said manufacturing company.", It was further stipulated that whenever one-half of 'the water power furnished by the company's dam should be inadequate to furnish them their respective measures of water power aforesaid, then, that during such period there shall be furnished to Joseph B. Ficklen sufficient water to run five pair of stones and accompanying necessary machinery, and Thomas F. Knox five pair of stones and accompanying necessary machinery "being the estimated volume of the first or 'Falls Mill' right owned jointly by them."

The appellant at first assails the correctness of the Duval award but finally admits that time has probably cured the defects in that award. It is then insisted that, if the award be accepted as correct, inasmuch as Ficklen, under the agreement of 1878, was accorded thirteen and one-half cubic feet per second for every run of stone under the first right, Knox for his nine run of stone is entitled to one hundred, seven and one-half cubic feet per second, but the agreement between Ficklen and the power company of 1878 was a purely private agreement between these parties, and does not affect the right of Knox in any way.

The appellant assumes that the "Falls Mill" dam impounded "practically all of the flow of the river" and says that this is evident from the diagram hereinbefore inserted. But it is by no means evident from said diagram, nor is it otherwise established by the evidence and all calculations based on the flow of the river are consequently unreliable. The plaintiff also undertakes to determine the amount of water to which the Knox mill site is entitled by testimony as to the wheel capacity of the Knox mill, as to flour produced, and as to the horse power necessary to run nine sets

of stones, but in all these calculations she ignores the fact that the water rights to which the Knox mill site is entitled are not measured by the capacity of the Knox mill, but by the contracts by which the rights were acquired. These questions are dealt with and the theories of the appellant disposed of in the written memorandum of the learned judge of the trial court made a part of the record. We approve his conclusions except as herein otherwise stated.

All of the evidence of these various claims was produced before the master. In his report he states "voluminous depositions which are returned herewith, have been taken before your commissioner, and your commissioner has consulted many authorities and spent a great deal of time and thought in preparing his answer" on this subject. After reviewing the situation he concludes that the maximum right of the Knox mill site was sixty-two. and one-half cubic feet per second, and the minimum twenty-two and one-half cubic feet per second. Exceptions were filed to his report, and the learned judge of the trial court in passing upon these exceptions, said:

"There are two questions for the decision of this court:

"1. What are the water rights appurtenant to the Knox mill?

"2. Is the Knox mill property and water right appurtenant to it susceptible of partition in kind?

"The commissioner to whom these questions were referred, along with others, reported that the Knox mill was entitled to sixty-two and one-half feet of water per second as a maximum right, and twenty-two and one-half feet per second as a minimum right, and that the property is susceptible of partition in kind; and the questions now at issue arise out of exceptions filed by the plaintiff to these findings.

"I have read the evidence carefully and I have read the exhibits, and I have carefully read and considered the briefs of counsel. Both sides of the case were ably argued, and the notes of argument were illuminating.

\* \* \* \* \* \* \* \* \* \*

"If we accept 1st, that the rights in the water power afforded by the 'Falls Mill' dam, including Knox's rights, were made over, and hotchpotched at the formation of the Fredericksburg Water Power Company in 1851; and 2nd, that Knox could and did reserve to himself water rights which he did not theretofore own; and 3rd, if we accept the idea that those rights could be indicated by resurrecting in the imagination the old Knox mill as it actually existed or as it appears to have existed, then there is no getting away from the conclusions counsel for plaintiff reach.

"If the title papers settle the rights of the parties, and there is nothing in them, or not sufficient to justify these theories, then we must reach a conclusion as to the rights of the parties by a fair interpretation of the papers, independently of theories which may lead us very far afield.

"Knox and his predecessors in title were never riparian owners of water power on the Rappahannock river. Whatever rights he had he, or the Hollingsworths purchased from Ficklen, or Ficklen's predecessor in title. By deed of March 3, 1803, Hollingsworth (Knox's predecessor) purchased of Francis Thornton, and others, Ficklen's predecessors in title, the present site of the Knox mill property, and water power to be taken from the 'Falls Mill' dam, amply sufficient for two overshot wheels, provided same should not deprive said grist mill of an ample quantity of water on her present construction, and the deed limited the Knox mill to four pair of stones not to exceed six feet

in diameter. Hollingsworth was required to construct and keep in repair the raceway from 'Falls Mill' to the Knox mill, as it will hereafter be called for brevity. And the canal was to be dug amply large to convey water for at least five overshot wheels. It will be noted in passing that this canal was entirely out of proportion in size to the amount of water to be furnished the Knox mill.

"The sum total of the Knox mill purchase, however, is water for four pair stones not exceeding six feet in diameter, and accompanying machinery.

"By agreement of February 25, 1847, Ficklen, then owner of 'Falls Mill', agreed to sell to Knox one-half of all water power connected with and arising from or produced by said grist mill pond, and not heretofore conveyed to Hollingsworth (Knox mill), including one-half of water sufficient for the 'Falls Mill' whenever the quantity of water afforded by the pond may be enough for that purpose, and when not, then one-half of what it may afford, which is the first right, as well as one-half of any surplus which *may* at *any time* exist after satisfying the said first right and the right heretofore conveyed to Hollingsworth as aforesaid, which is the second right. But none of the water power sold said Hollingsworth *shall* be used on the premises of said Ficklen, etc., and this same agreement provides for the employment of a competent person to ascertain the relative interests of the parties in the water power. Pursuant to this latter clause Alfred Duval, millwright and engineer, was employed to carry out the agreement in this respect.

"It is beyond the province of any court at this late day to say whether Alfred Duval's award of water power was correct or incorrect. The award was made nearly three-quarters of a century ago; it was accepted

by the parties over their own signatures and rights of third parties have more than once attached to the rights so established.

"That award evidently converted or translated water sufficient to run a certain number of burr stones into cubic feet of water per second for he says (referring to Oliver Evans' Treatise on Hydraulics) that the quantity of water necessary to be used to propel four pair of stones and machinery, is forty cubic feet per second discharged on overshot wheels sixteen feet in diameter.

"He found that Knox was entitled to, under the Hollingsworth purchase of 1803, water sufficient to run four pair of six feet stones and machinery, and he translated this into forty cubic feet of water per second. Ficklen had, as set out above, sold Knox one-half of all the water power connected with, or produced by, the 'Falls Mill' dam, not theretofore conveyed to Hollingsworth (with provision for low water), and this amount Duval apparently ascertained to be on a fair average (for it must be remembered, or it is at least to be presumed, that he was measuring and dealing with the whole power furnished by the 'Falls Mill' pond) forty-five cubic feet per second, of which Ficklen was entitled to one-half or twenty-two and one-half cubic feet per second, and Knox was entitled to a like quantity, and that Knox as a second right owned forty cubic feet per second the 1803 Hollingsworth purchase. He then adds that Messrs. Ficklen and Knox own jointly and equally the residue of the water, *after* the said first and second rights are supplied. Now there is no question as to what the Knox mill is entitled in cubic feet per second as translated from water to turn a certain number of stones, under its first and second rights in the power afforded by the Falls mill pond up to this stage of the proceeding. In other words, when the whole

power of the pond was only equal to eighty-five cubic feet per second then Ficklen could only discharge twenty-two and one-half feet per second and Knox only sixty-two and one-half feet per second and when the whole quantity was reduced to forty-five feet per second or less, then both Ficklen and Knox were required to reduce their orifices of discharge so as to cause equal discharges in equal time. The one-half interest which Knox owned in the water power afforded by the Falls mill pond over eighty-five cubic feet per second was an indefinite and uncertain thing even at the time of the award. Whether it really ever afforded more than eighty-five cubic feet per second is not shown by the record with any sort of satisfaction. There is a provision for a division of the flow if it ever fell to or below forty-five cubic feet per second and this finding by the arbitrator was necessary because of the title papers. But the record in this case really throws no light on what this third right of the Knox mill was, under the Duval award.

"We come now to the agreement of April 15, 1851. Under this agreement the foundation was laid for the incorporation of the Fredericksburg Power Company, predecessor in title to the present defendant.

"It is argued and contended by counsel for plaintiff that the parties who entered into this agreement pooled or hotchpotched their interests, and that Knox, by some means, came out of the deal with a right of from one hundred and sixty to one hundred and eighty cubic feet of water per second or thereabout. A fair construction of the title papers doesn't justify any such conclusion. Ficklen and Knox had nothing to put into the pool but the 'water power of the (Rappahannock) river which is now owned by them at their respective mills,' meaning of course the water power

afforded at the Falls mill dam, the only indefinite thing about which was what the pond may afford in water over and above eighty-five cubic feet per second if it afforded any water over this amount at any time. That Ficklen and Knox came out after the agreement only with what they went into it, with the exception that they were relieved from the expense of keeping up a dam and raceways, and had their water delivered to them free of charge, is evidenced by the fact that they declare over their signatures 'that in the event that the said manufacturing company be formed and organized and shall proceed to execute the purpose before described, then they the said parties of the first part and their heirs will be content to take and receive the *present* measure of water power to which they are entitled to *now*, and hold appurtenant to their said mill sites respectively, amounting to a water power equal to the running of five pairs of stones of a diameter of five feet and the necessary accompanying machinery as appurtenant to the mill site of J. B. Ficklen, and amounting to a water power equal to the running of nine pairs of stones, five feet in diameter with the necessary accompanying machinery as appurtenant to the mill site of the said Thomas F. Knox.' As Knox, who was not a riparian owner, had no right to water power except such as he had purchased, and as he had purchased nothing since the Duval award, agreed to take from the proposed manufacturing company the *present* measure of water which he was entitled to *now*, the only reasonable conclusion is that he and those contracting with him were converting back into power to run a certain number of stones the same power which Mr. Duval expressed in cubic feet of water per second. Our task now is to translate that back into cubic feet per second and we must do this according to the

method followed by Duval, since his conclusions were the basis of the agreement of the parties at the time the transaction was consummated.

"If I am correct in this we have:

"The Knox mill entitled as a first right to twenty-two and one-half cubic feet per second.

"And as a second right to forty cubic feet per second.

"Total sixty-two and one-half cubic feet per second.

"And as a third right, if we can get anything definite to base the calculation upon to one-half of the power afforded by the Falls mill dam (when and if it afforded any such power) in excess of eighty-five cubic feet per second. The nine pair of five foot stones represented this power whatever it was. Counsel for complainant claim first, that it takes thirteen and one-half cubic feet per second for each five foot stone and accompanying machinery; and second, that the Knox first right twenty-two and one-half cubic feet per second, and his third right, that is the power in excess of eighty-five cubic feet per second, were combined in the contract of 1851, giving Knox a first right of power to run five pair of stones and necessary machinery or according to their calculation sixty-seven and one-half cubic feet per second, as a first right, and in addition to this they claim as a second right that Knox is entitled to power to run four five foot stones (the Hollingsworth purchase of 1803). Duval calculated a run of five foot stones and machinery to require ten cubic feet per second to each run of stone. Knox and Ficklen accepted this as co rect and agreed to be *content* to take the water they are getting *now* which is equivalent to saying that they were willing to take ten cubic feet per second for each run of five foot stones. So that the claim of thirteen and one-half cubic feet per second or any amount above that is not justified by the title

papers or any pertinent evidence in the case; at best admitting that Knox is entitled as a first right to power for five pairs of five foot stones, after combining his first and third rights and making a first right of the two, Knox could only claim as a first right expressed in cubic feet per second fifty cubic feet, and on his second right he could claim only forty cubic feet per second, making a total maximum to which he would be entitled of ninety cubic feet per second, and a minimum of forty cubic feet per second.

"But what is there in the Duval award and the contract of 1851, or both, and they must be read together, because they are linked together by unmistakable language of the parties themselves, to justify the assumption that the first and third Knox rights were combined to make the five pairs of five foot stones power referred to in the contract of 1851? The contract doesn't say so. It distinctly says, after stating that the parties would be content to take the water which they are accustomed to take *now*.

" '*Ficklen as a first right* power for five pairs of five foot stones and Knox five pairs of five foot stones.'

"Knox was never, according to his own solemn agreement, entitled to but twenty-two and one-half cubic feet of water per second, under this right, and there is nothing in the contract to justify either the assumption that it had increased or that the first right and third right had been combined. On the contrary, it is significant that the water over eighty-five cubic feet per second afforded by the Falls mill dam, or the Knox third right, is nowhere referred to in the contract of 1851. The first right is specifically mentioned, and the second right is referred to, but the third right is not alluded to anywhere.

"Under the contract of 1851 the twenty-two and

one-half cubic feet per second or first or Falls mill right is converted into power to run five pairs of stones, and the remaining forty cubic feet per second was evidently left as it was heretofore contracted at the time of the purchase by Hollingworth in 1803, that is it was converted back into the same power which was originally contracted for, viz., power to run four stones.

"This would indicate that these parties took little or no account of the water afforded by the Falls mill pond over eighty-five feet per second and I think the fair presumption is that if there was any such power, it was only such as arose in flush water or such as was above normal, and uncertain and therefore of little value.

"These conclusions negative the contentions that Knox hotchpotched his rights, and drew out more than he put in, and that Knox reserved to himself rights that he did not own and that the way to ascertain the extent of his right was to erect in the imagination the old Hollingsworth or Knox mill. The reasons for not accepting the first two contentions have been fully set out in the foregoing pages. Knox was not a riparian owner and he had nothing to put into hotchpotch except what he had purchased, and could take out nothing except what he owned unless someone granted him further rights. There is no grant of any further rights. On the contrary, the contract of 1851 expressly limits what he is entitled to under the contract to water to which he is now entitled. The Knox mill which has been resurrected in the imagination can throw no light on what power the Knox mill is entitled to because the power was absolutely fixed by that afforded by the Falls mill dam or pond and not by the size of the Knox mill.

"For many years before its destruction in 1901, the Knox mill was not used for grinding flour. What sort of machinery was used there for thirty years is not ·shown. How much power it took to drive this machinery is not shown. How much power was leased, if any, from the Fredericksburg Power Company in addition to that which the company was under obligation to deliver free is not shown. Indeed there is nothing in the record which throws any light whatever on the amount of power which the Falls mill pond may have afforded above eighty-five cubic feet per second.

"If it were not for the fact that the contract of 1851 expressly converts the twenty-two and one-half cubic feet per second owned by Knox as a first right, into power to run five pair of five foot stones, the court might be justified in concluding that the power to run nine pair of stones to which Knox was entitled was equivalent to ninety cubic feet of water per second, as Duval in all his calculations had allowed ten cubic feet per second to each pair of stones, but since the power to run the original four stones purchased by Hollingsworth had been definitely converted into forty cubic feet of water per second and the parties themselves had by the contract converted the twenty-two and one-half feet per second into power to run five pair of five foot stones, the power to run the nine pairs of stones to which Knox is entitled under the contract is made up as follows:

"First right, five pair of five foot
stones_____22½ cu. ft. per sec.
"Second right, purchased in 1803,
four pair stones_____40    cu. ft. per sec.

"Total_____62½ cu. ft. per sec.
"The result seems somewhat inconsistent, but we are

at least holding the parties as prospective grantors, to the language they chose to express their meaning, rather than wandering into the realms of speculation as to what they meant by assuming that two rights were combined without any language to justify it, or without resurrecting the old Hollingsworth mill, in an effort to shed light upon the question. For the foregoing reasons the exceptions to the commissioner's report on this branch of the case is overruled."

We are unable to concur in so much of the foregoing opinion as gives the Knox mill site as a maximum only sixty-two and one-half cubic feet of water per second and thereby reaches a result which is "somewhat inconsistent."

The Duval award fixed the *first* right at the "Falls Mill" dam, as between Knox and Ficklen, at forty-five cubic feet per second, which was to be equally divided between them; the *second* right, wholly the property of Knox, at forty cubic feet per second, and determined that all water afforded by the dam in excess of eighty-five cubic feet per second was to be equally divided between them. The last mentioned right, which may be called the *third* right, was of indeterminate quantity and value, and it was natural that, when the parties were transferring all of their property in the water to a third person, they should eliminate this item of uncertainty and fix a value thereon to be paid by their grantee. This they accomplished by the agreement of 1851, which changed the value of the *first* or "Falls Mill" right, although it made no mention of the *third* right and assigned no reason and stated no consideration for the enhancement of the value of said first right. The agreement of April 15, 1851, between Ficklen and Knox on the one side and the parties who were to organize the

38

Fredericksburg Power Company on the other, fixes a new and different quantity of water as the value of such first right, to-wit: "A water power equal to the running of ten pair of stones, with accompanying necessary machinery, to-wit: Josheph B. Ficklen five pair of stones and Thomas F. Knox five pair of stones, *being the estimated volume of the first or 'Falls Mill' right owned jointly by them.*" (Italics supplied). Whatever may have been the quantity previously deliverable under this first right, the agreement of 1851 fixed it for the future at five pair of stones each to Ficklen and Knox. The agreement also fixed the maximum quantity of power to be furnished to Knox and Ficklen—Knox was to have sufficient power to run nine pair of stones and Ficklen five. Duval, by his award, fixed the unit of power for each pair of stones at ten cubic feet per second and in the deed from Ficklen to Knox dated June 27, 1851, conveying to the latter the rights conferred by the agreement of February 25, 1847, the Duval award is made a part thereof, and we do not doubt that in fixing the power to run each pair of stones in the agreement of April 15, 1851, the parties had in mind and dealt with reference to the unit of power fixed by Duval, to-wit: ten cubic feet of water per second. Taking this as a basis, we find that the Knox mill site is entitled to receive as a maximum, under "the first or 'Falls Mill' right," power for five pair of stones, or fifty cubic feet per second, and under the second or Hollingsworth grant power for four pair of stones, or forty cubic feet per second, or in the aggregate for the two rights ninety cubic feet per second. Under the same agreement of 1851, the Ficklen property, now the Bridgewater Mills property, was to receive power for five pair of stones, or fifty cubic feet per second, but the contract provided that

whenever one-half of the power generated by the dam of the company was not sufficient to furnish to Knox and Ficklen their respective measures of water power hereinbefore described, then during that period there shall be furnished to each Knox and Ficklen a water power equal to the running of five pair of stones. The minimum, therefore, to which the Knox mill property is entitled is fifty cubic feet per second. As to this minimum and the water to be furnished the Ficklen or Bridgewater mills property, the agreement contains no limitations upon the power capacity of appellee's dam. We are of opinion that the Knox mill site is entitled under the agreement of 1851 to ninety cubic feet of water per second as a maximum rate under the conditions hereinbefore stated, and to a minimum rate of fifty cubic feet per second.

It is assigned as error that the trial court held that the water power could be separated from the land and that it was susceptible of partition in kind between Mrs. Ficklen owning a nine-tenth's interest and the Spotsylvania Power Company owning a one-tenth interest.

The first bill of the complainant prayed "That the said real estate, together with all water and other rights, easements and privileges and benefits thereto appertaining, be partitioned between the parties entitled thereto, or in the event that such partition be impracticable that it be sold and the proceeds divided among those entitled thereto according to their respective rights." In this prayer the appellee united and the enquiry submitted to the master was "whether the said real estate and water rights attached thereto is practicable for partition in kind between the respective owners." The evidence on the question was conflicting, but the master reported "that both the real estate

and also the water rights attached thereto are susceptible of a practical partition in kind between the respective owners thereof. The defendant owns real estate adjoining the real estate which is the subject of this suit and one-tenth thereof could be readily apportioned to said defendant and nine-tenths thereof to the plaintiff without injury to the rights of either. The defendant owns the head of water and water works supplying the same, and said power is susceptible of practical division in kind, the defendant retaining one-tenth and delivering nine-tenths thereof as defined under response to enquiry No. 4 hereunder, without impairing the value of the several portions. The smaller interest is the only one that could suffer, if any, according to the evidence, and the owner of the same requests such division in kind." The ruling of the trial court thereon was as follows: "The commissioner has found after hearing all the evidence that the whole property is susceptible of partition in kind, that is the real estate and the power. This being true and there being a conflict of the evidence, this court does not feel justified in sustaining the exceptions to this finding."

[3-5] There is nothing inherent in a water power which prevents a partition thereof in a proper case. "As a general rule, water power or the right to take and use running water for a particular purpose may be actually divided among the coproprietors thereof." 21 Am. & Eng. Encl. Law (2nd ed.) 1161. In 40 Cyc. 741, it is said: "A water right may be the subject of a voluntary or judicial partition under suitable circumstances." What are suitable circumstances is well illustrated in *Cooper* v. *Cedar Rapids Co.*, 42 Iowa, 398; *Doan* v. *Metcalf*, 46 Iowa, 120; *Roberts* v. *Claremont Ry. & L. Co.*, 74 N. H. 217, 66 Atl. 485, 124 Am.

St. Rep. 962. The circumstances of this case, however, do not render it necessary to go into any discussion of this question. The finding of the commissioner is to be interpreted in the light of the language used in the order of reference to which he is responding, and as we interpret his report, he found that the real estate and the water rights attached thereto were susceptible of convenient partition in kind between the parties entitled thereto; and the trial court overruled the exceptions of the appellant to that report and confirmed it. Whether or not the partition was practicable was a question of fact to be determined from the evidence in the case, and the commissioner, upon conflicting evidence, found that it was. The rule in this court is that, where the evidence is conflicting, this court will not reverse the action of the trial court overruling an exception to the report and confirming it, unless the finding of the commissioner is clearly erroneous. *Howard* v. *Gose*, 112 Va. 555, 72 S. E. 140; *Shipman* v. *Fletcher*, 91 Va. 473, 22 S. E. 458. The case in judgment is not one in which the judgment of the trial court on this question should be disturbed.

[6, 7] It is assigned as cross error by the appellee that the court held that the appellee was obliged to furnish the appellant for use elsewhere than at · the Knox mill site, the amount of water to which Knox was entitled to have delivered at said site, and that this was error because the water was appurtenant to the mill which had been burned in 1901, and as there was no longer any mill on the premises, the appellee could not be compelled to deliver the water there to be carried thence for a different use at another place.

No restriction was put upon the use of the water when it was granted. Thornton and Dunbar, who owned and operated the "Falls Mill," in consideration

of five thousand dollars, sold and conveyed to the Hollingsworth brothers, a mill site of an acre and a half of ground and water to be taken from their "Falls Mill" dam sufficient to run two overshot wheels to turn four pair of stones not exceeding six feet in diameter. This was simply a measure of the water to be delivered, and not a restriction or limitation upon the manner of its use or where the grantees should take it after delivery to them. 41 Cyc. 752. The purpose of the purchase was for the erection of a flour mill and such a mill was in fact erected on the site purchased and operated for many years. As stated, no restriction was placed on the use of the water in the original grant or in any of the subsequent deeds of the property, and as the grantees were to engage in the same business that the grantors were then engaged in, and to become their competitors, it will not be presumed that the grantors intended to restrict the use of the water to that particular point or for that purpose. The grantors purchased the fee simple in the land and water, without restriction or limitation of any kind, and it would seem that five thousand dollars in 1803 was a large price to pay for it. Furthermore, if any such restrictions as are now claimed could ever have been implied from the grant of 1803, they would seem to have been removed by the agreement of 1847 between Ficklen and Knox, the then owners of the "Falls Mill" property and the Knox mills property. By that agreement Knox purchased of Ficklen one-half of the remaining water right of the "Falls Mill" property, with the right to convey it to his mill "or wherever else he may wish to use it, not on the premises of said Ficklen." It was "further agreed that no water shall be used at the 'Falls Mill' after the present year, but the said mill and other houses may be moved or

otherwise used as the said Ficklen chooses, the said
Knox having no interest in them, and the race leading
to the said 'Falls Mill' shall be then stopped up at the
joint expense of the parties.   It is further agreed that,
with a view to the use of the said Ficklen's portion of
the water by him or his assigns below the bridge, if
he shall choose to do so (though he may use it wherever
he chooses not on the premises of said Knox), pro-
vided none be used at the 'Falls Mill', etc." The
object of this agreement was to get rid of the "Falls
Mill" entirely and apparently to forbid both parties
to use the water from the "Falls Mill" dam on the
"premises of the said Ficklen" or at the site of the
"Falls Mill." Certainly the use of the water then
purchased was not limited to the Knox mill property,
as he is expressly granted the power to convey it
"wherever else he may wish to use it." This contract
when read as a whole would seem to indicate that none
of the water involved was regarded as restricted in
its use to any particular piece of land.   Text-writers
generally lay down the law as we have stated it and
cite abundant authorities to support them.   For in-
stance, it is said in 40 Cyc. 751, 752, 753, "In the
absence of specific restrictions in the grant of a water
power the grantee may make such use of the water as he
chooses, provided only that he does not thereby inter-
fere with the rights of others, but the grantor may
specifically restrict the use for which the water may
be employed, and when this is done it is an effective
limitation upon the rights of the grantee.   *   *   *
There is no restriction as to place where water or power
granted shall be employed or enjoyed unless specified
in the conveyance or contract.   *   *   *   *

[8] "In a grant of a certain quantity of water or
water power, or so much as may be sufficient for the

operation of the particular plant or the conduct of a particular business, the specification of the purpose for which it is to be used, is usually taken as a measure of the quantity rather than as a limitation of the use, and the grantee is not bound to use it in the particular manner described, but may use it in a different manner, for a different purpose, or at a different place, or increase the capacity of his machinery, provided only that the quantity used is not increased."

In 27 R. C. L. 1248, sec. 158, it is said: "In granting water rights the purpose for which they are to be used is frequently mentioned, and the question then arises as to whether or not the grant is limited to that use. In considering this question it must, of course, be conceded that the grantor is entitled to restrict use to specified purpose, but in construing a provision in the grant of water power limiting the use to be made thereof, it has been customary for the courts to adopt a liberal construction and to favor that interpretation which will be least burdensome to the grantee. That interpretation should always be preferred which will give the grantee an unrestricted, rather than a limited, right to the quantity granted, for such a construction is more beneficial to the community, and to the grantee, and can seldom injure the grantor. It may therefore be stated as a general rule that wherever the wording of a deed makes it doubtful whether a limitation of the quantity of water power, or a restriction of the use of the water power is contemplated, the courts will adopt the former construction. Ordinarily a mere mention of a particular use is not of itself sufficient to make that use exclusive. Nor will a construction which would restrict the grantees to the specific use to which the water was first applied be adopted unless the language of the grants unmis-

takably indicates that this was the intention of the parties.''

[9] The appellant is proposing to convey her share of the Knox mill water to property now owned by her, but which was part of the Ficklen property in 1847. This is objected to by the appellee because by the agreement of 1847 Knox was forbidden to carry the water he obtained by that agreement ''on the premises of said Ficklen.'' The appellee is not the owner of, nor interested in, the Ficklen premises upon which Knox was forbidden to carry the water, and hence cannot be heard to raise that objection.

This disposes of all the questions raised which we need consider. The trial court erred in fixing the amount of water to which the owners of the Knox mill property are entitled to have delivered by the appellee. To this extent the decree of August 14, 1920, will be reversed and the cause remanded to the Circuit Court of Spotsylvania county with directions to conform its decree to the views hereinbefore expressed. Costs will be decreed in favor of the appellant.

*Reversed and remanded.*